Case 1:18-mj-01104-SAG Document 3 Filed 04/27/18 Page 1 of 20

FILED\_\_\_\_\_ ENTERED
LOGGED\_\_\_\_\_ RECEIVED

APR 27 2018

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY\_\_\_\_\_ DEPUTY

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Task Force Officer Jeffrey J. Lilly, being duly sworn, depose and state as follows:

1. I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am a Detective with the Baltimore Police Department. Since October 2015, I have also been an FBI Task Force Officer (TFO), and assigned to the operational intelligence section of the Baltimore Safe Streets Task Force investigating violent criminal organizations. In that capacity, I have been involved in drug investigations, including Organized Crime Drug Enforcement Task Force (OCDETF) investigations involving the trafficking of cocaine and heroin. I am therefore an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I joined the Baltimore Police Department in November 2004. After completing entrance training, I was assigned to the Central District Patrol Division, where I patrolled the Upton and Reservoir Hill communities. These neighborhoods are notorious for narcotics and vice activity. While a patrol officer, I participated in the execution of numerous search and seizure warrants and made more than two hundred arrests for narcotics violations. Since 2013, I have held the rank of Detective in the Baltimore Police Department. Since becoming a Detective, I have actively participated in investigations of criminal activity, including but not limited to investigations of drug trafficking. During these investigations, I have participated in the execution of search warrants and the seizure of evidence, including evidence related to drug trafficking activities. I have also applied for and

served as the affiant for search and seizure warrants. These investigations have resulted in the arrest and conviction of numerous individuals responsible for trafficking narcotics and committing violent crimes.

3. Since November of 2004, I have received over 130 hours of specialized training in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications, narcotics, and various other crimes. Finally, I have testified in judicial proceedings and prosecutions for violations of federal and state narcotics laws. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting homicide investigations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; conducting court-authorized Title III wiretap investigations; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

4. Through my training and experience in drug trafficking investigations and arrests, I am familiar with the actions, traits, habits, and terminology utilized by drug traffickers. I am familiar with the ways in which narcotic traffickers conduct their business, including methods of importing and distributing narcotics, money laundering, the use of cellular telephones and the internet to facilitate their illegal acts, and the use of numerical codes and code words to conduct drug transactions. During my time in law enforcement, I have learned the following:

      a.    Persons involved in the illegal distribution of CDS keep and maintain records of their various activities. Experience in similar cases has established that such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. The aforementioned items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. I know that drug traffickers often have several residences decreasing the likelihood of detection by law enforcement.

      b.    Persons involved in the illicit distribution of CDS, due to advancement in technology, may be utilizing computers or other electronic storage media to store the records listed above.

      c.    Persons involved in the illicit distribution of CDS utilize cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals.

      d.     Persons involved in the illicit distribution of CDS take or cause to be taken photographs of themselves, their associates, their property and their product. These traffickers usually maintain these photographs in their possession, in locations such as their homes, vehicles, cellular phones and electronic devices, or on their person.

## SUBJECT TELEPHONES

5.    This affidavit is being submitted in support of an application for a search warrant authorizing the search and seizure of information from the following cellular telephones:

- a silver iPhone/Model A1662 with case, IMEI 356597080726743 ("SUBJECT TELEPHONE 1");

- a gold iPhone/Model A1662 with case, IMEI 353790082573162 ("SUBJECT TELEPHONE 2"); and

- a silver iPhone/Model A1662 with cracked screen, IMEI 356597080723898 ("SUBJECT TELEPHONE 3").

The SUBJECT TELEPHONES were seized from ERIC MCKNIGHT's person during the execution of a federal arrest warrant on February 26, 2018 by the FBI. All of the SUBJECT TELEPHONES are now in the custody of the FBI.

6.    Because this Affidavit is being submitted for the limited purpose of establishing probable cause for a warrant to search SUBJECT TELEPHONES, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause in support of this application for a search warrant. The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and

other individuals. All conversations and statements described in this affidavit are described in substance and in part unless otherwise indicated.

## PROBABLE CAUSE

7. Based on investigation to date, there is probable cause that Eric MCKNIGHT, and the other Target Subjects, and other individuals, both identified and unknown, are trafficking heroin in Baltimore, Maryland and elsewhere. Initial information involving MCKNIGHT was obtained during the course of a wiretap investigation conducted by the Baltimore County Police Department pursuant to a state court wiretap authorization. That information led to an ongoing investigation of MCKNIGHT, including controlled purchases from MCKNIGHT, and additional evidence acquired during a separate wiretap investigation. On at least two occasions, including on June 14, 2017 and on August 18, 2017, FBI investigators arranged for a cooperating informant to contact MCKNIGHT and to purchase heroin from MCKNIGHT.

8. Investigators obtained federal wiretap orders for two cell phones used by MCKNIGHT. Interception of wire communications on TARGET TELEPHONE 2, (443) 554-8104 (hereinafter TT2), used by MCKNIGHT commenced on February 14, 2018, pursuant to a wiretap order signed by a Judge of the United States District Court for the District of Maryland. Of note, the IMEI for TT2 and SUBJECT TELEPHONE 1 are identical. Investigators suspect that SUBJECT TELEPHONE 1 is in fact TARGET TELEPHONE 2, and the requested search warrant will allow for confirmation of that.

9. On February 16, 2018, MCKNIGHT (using TT2) had the following SMS exchange with "DAVON" using 443-842-2673:

DAVON (6:09pm (Session 612)): What a QP go for

MCKNIGHT (6:21pm (Session 622)): For u 625

Based on my training, knowledge, and experience, I believe that "DAVON" was asking MCKNIGHT how much a quarter pound of ("QP") marijuana sells for. MCKNIGHT responded to "DAVON" that it would be $625.

10.   On February 16, 2018, MCKNIGHT (using TT2) had the following SMS exchange with an unknown male (UM) using 443-570-0125:

UM (6:18pm (Session 618)):   Need a 5pc u around

MCKNIGHT (6:21pm (Session 624)): ok omw

MCKNIGHT (6:21pm (Session 626)): From mondawmin

UM (6:22pm (Session 630)) ok

UM (6:47pm (Session 646)): Yooo

MCKNIGHT (6:47pm (Session (647)): here

UM (6:51pm (Session 648)): I'm here

MCKNIGHT (7:01pm (Session 651)): Coming

Based on my training, knowledge, and experience, the UM and MCKNIGHT were coordinating to meet so UM could purchase a "5pc" (referring to 5 grams of heroin) from MCKNIGHT.

11.   On February 27, 2018 at 4:44pm (Session 928), MCKNIGHT (on TT2) made an outgoing call to "ROCK" and "Ms. NEECY" (phonetic) at 443-979-6651. Prior to the call connecting, an unknown male in the background asked MCKNIGHT what people are saying about the "smack," MCKNIGHT replied "They ain't tell me nothing about the coke i ain't get no bad readings with em." When the call connected, MCKNIGHT asked for ROCK, but ROCK is not around. MCKNIGHT asked Ms. NEECY "How was that um that hard that ready?" and Ms. NEECY responded "Um. I didn't like it myself." MCKNIGHT and Ms. NEECY briefly continued to discuss the quality of the drugs. Based on my training, knowledge, and experience, I believe

that MCKNIGHT was attempting to get feedback on the most recent cocaine MCKNIGHT let ROCK test.

12. On February 17, 2018, MCKNIGHT, using TT2, received an incoming call from an unidentified male (UM) using 443-253-9981 (Session 1039). The UM advised MCKNIGHT "I ain't gone lie bro everybody they keep calling saying that's a winner. You heard me?" and MCKNIGHT responded "Yeah." MCKNIGHT stated to UM, "I'm putting. Ima put 'erything together for you now. 'Ey how you want me do it. You want put it together yourself?" UM responded "Naw. you you do it bro, cause you doing it exactly how it need to be done." MCKNIGHT clarified, "Like look naw this what I'm saying far as you putting. Like you want cap it up yourself?" UM responded, "Oh yeah I can, yeah I can do that." MCKNIGHT continued, "I'm asking you, cause like I mean I can cap 'em up, you feel me. It's up to you." UM responded, "Naw I do it. I do it bruh." Based on my training, knowledge, and experience, I believe that the UM was telling MCKNIGHT that the current product MCKNIGHT had out of the street at that time was very good, and was getting positive feedback. When MCKNIGHT told UM that he (MCKNIGHT) was putting everything together for UM and asked if the UM wants to "cap it up" himself, it was clear MCKNIGHT was processing or mixing the heroin for street sales. Your affiant is aware from training and experience that once mixed with cutting agents, heroin is packaged or capped up for individual sales. Based on information uncovered during this investigation, coupled with previous source reporting, MCKNIGHT is known to be source for the production of scramble heroin (mixing heroin, and a cutting agent to increase profits and to stretch the product).

13. On February 18, 2018, at 12:41pm, MCKNIGHT, using TT2, received an incoming call from Samuel PAIGE, a/k/a "Uncle Sammy" using 410-566-5427 (Session 1613). PAIGE

advised, "And it's still holding man" to which MCKNIGHT responded, "That motherfucker the truth huh?" PAIGE continued, "It ain't nothing but the truth. Yeah you got a winner there." MCKNIGHT later informed PAIGE, "Ard, when you come down, call me. I got something else for you." Based on my experience, training, and knowledge of this investigation, PAIGE was informing MCKNIGHT the heroin MCKNIGHT let him test is good, and holding potency well. MCKNIGHT uses PAIGE as a tester and has additional drugs to sample once PAIGE comes down from his current heroin high.

14. On February 18, 2018 at 1:47pm, MCKNIGHT placed an outgoing call from TT2 to an unidentified male (UM) using 410-920-9634 (Session 1632). MCKNIGHT asked the UM where the UM was then informed the UM, "Ard, couple plays is up here. I'm right here, Iamma bout to just hit'em son" and the UM responded, "Ard, I'm on my way back right there anyway. I was just gonna get a bite real fast. I just ran out." MCKNIGHT continued, "Ard, I'm up here yo. I'm tryin' to give yo your shit. I'm about to give 'em to Wiggins yo" and the UM responded, "Ard, Ard, yeah. I'm ready to get em from Wigs. Good lookin' babe." Based on my training, knowledge, and experience, I believe that MCKNIGHT was checking on the UM because MCKNIGHT did not see him out on the block where the conspiracy's open air drug shop is located. That is why MCKNIGHT was asking about the UM's location. MCKNIGHT informed the UM that there were some "plays" or drug customers "up here" (meaning the drug shop). MCKNIGHT told the UM that he was about to just "hit'em" (make the drug transactions himself). MCKNIGHT also told the UM that he had the UM's "shit" for him. Your affiant believes, based on training and experience, that MCKNIGHT was prepared to provide a re-supply of additional narcotics or money for the UM for when he returned, and that "Wiggins" was holding it for him.

15. On February 19, 2018, MCKNIGHT using TT2, received the following SMS from

8

unknown male (UM) using 443-920-9634 (12:08pm (Session 1785)): "come grab this nickele off me Im at a1". Based on my training, knowledge, and experience, the UM was asking MCKNIGHT to come get $500 ("this nickele," misspelled by sender in SMS) from him, and that the UM was around at the store ("a1"). It is common practice for street-level or street-corner drug dealers to give money to their supplier or management throughout the day so that the street dealers are not caught by the police with large amounts of cash on their person.

16. On February 19, 2018, at 3:01pm, MCKNIGHT, using TARGET TELEPHONE 2, placed an outgoing call 443-813-6663 (Session 1809). The call never connected, but MCKNIGHT and a UM could be heard speaking in the background. MCKNIGHT stated "you see how they, you see them always down in Arundel Mills" and the UM responded "Yeah (UI) I'll prolly, I'll prolly sit with like, I'll probably be sitting with WB, but like, then a nigga coming up from 301. You feel me? So it's like, it's like I already told WB like whatever he makin I'll split him but the 32 is what sold it so if he just do the 1 like he could go up on a nigga tomorrow. Be like man the number 33, 34 then you start making out, you feel me? But just to get the joint done. I just want like man...." The call never connected with the intended recipient. Based on my training, knowledge, and experience, MCKNIGHT and the UM in the background were talking about the cost associated with kilogram level purchases of cocaine while they were waiting for recipient to answer the call. The UM talked about sitting with "WB" in the vicinity of Arundel Mills while waiting for someone to come up 301 (this was believed to be a reference to Route 301). UM mentioned that he had already spoken with "WB" about splitting the costs and turning a quick profit.

## SEIZURE OF THE SUBJECT TELEPHONES

17. On February 26, 2018, investigators executed federal search and seizure warrants signed by the Honorable United States Magistrate Judge J. Mark Coulson, at four residences in the Baltimore, Maryland area: 3614 W Lexington Street; 228 N Culver Street; 202 N Culver Street; and 1211 Cleveland Street.

18. 3614 W Lexington Street had been identified as a probable stash location because MCKNIGHT had been observed entering and exiting the location on numerous occasions (including via physical surveillance as well as surveillance from covert pole cameras set up to observe areas that were frequented by members of this conspiracy). Many of MCKNIGHT's activities at the location would precede or immediately follow suspected drug deals and agents believed that 3614 W. Lexington was a location where MCKNIGHT stored drugs and related items. During the search of 3614 W. Lexington Street, due to the possible presence of fentanyl in the residence, the residence was searched by members of the Drug Enforcement Administration (DEA) in full protective suits. During the search, three firearms, drug packaging materials, drug processing materials, capping trays, suspected cutting agents, containers of unknown liquids, bags of unidentified powders, and cell phones were located in the basement of 3614 W Lexington Street. Due to the potential contamination of fentanyl, the bags of powder and containers of liquid were packaged together, making lab testing the only safe option (as opposed to field testing at the scene). The seized materials were transported to the DEA laboratory on March 1, 2018. Analysis is pending.

19. During the February 26 operations, investigators recovered the SUBJECT TELEPHONES. Specifically, the SUBJECT TELEPHONES were seized from MCKNGIHT's person during the physical arrest.

## CONCLUSION

20. Based on the aforementioned facts, I believe that there is probable cause that the telephone seized from MCKNIGHT have been used in furtherance of his illegal drug activities in violation of 21 U.S.C. § 846. Further, there is probable cause to believe that names, telephone numbers, stored numeric and/or text message, and photographs previously transmitted to and/or store in the seized telephone may identify other individuals involved in violations of federal narcotic laws. Therefore, I am seeking authorization to search, access and retrieve any and all stored electronic information contained therein, including but limited to the internal telephone book directory, all incoming, outgoing and missed calls, all numeric, voice, and text message, all photos and videos: and any other information contained in the SUBJECT TELEPHONES seized during the arrest of MCKNIGHT February 26, 2018 and currently in the custody of law enforcement in the District of Maryland, all of which constitutes fruits, evidence, and instrumentalities of violation of 21 U.S.C. § 846, namely conspiracy to distribute and posses with the intent to distribute narcotics.

21. Given the confidential nature of this continuing investigation, I respectfully request that this affidavit and all of the papers submitted herewith be maintained under seal until otherwise ordered by this Court. Further, given the ongoing nature of this investigation, I hereby request to delay the notice required by FED. R. CRIM. P. 41 for a period of 30 days. Additionally, because the cell phones are in law enforcement custody, I request permission to execute the requested search warrant at any convenient point during the authorized period, including during the night time.

WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for the SUBJECT TELEPHONE and authorize the search and seizure of the items described in the attachment hereto.

TFO Jeffrey Lilly
Baltimore Police Department
Federal Bureau of Investigation

Sworn to before me this 13th day of April, 2018

Hon. Stephanie A. Gallagher
United States Magistrate Judge

## ATTACHMENT A

The following devices (SUBJECT TELEPHONES),

    A silver iPhone/Model A1662 with case, IMEI 356597080726743 ("SUBJECT TELEPHONE 1");

    A gold iPhone/Model A1662 with case, IMEI 353790082573162 ("SUBJECT TELEPHONE 2");

    A silver iPhone/Model A1662 with cracked screen, IMEI 356597080723898 ("SUBJECT TELEPHONE 3"),

which were seized from ERIC MCKNIGHT during the execution of a federal arrest warrant on February 26, 2018 by the FBI, and which are currently in the custody of law enforcement in the District of Maryland.

## ATTACHMENT B

The SUBJECT TELEPHONES may be searched for the following items, which may be seized: All records, documents, items, data and other information that may constitute fruits or instrumentalities of, or contain evidence related to violations of 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute narcotics), including, but not limited to, the following:

1. Information that identifies the conspiracy's unknown co-conspirators and accomplices;

2. The location of stash houses for money and/or narcotics throughout the United States or abroad;

3. Shipping company documents, tracking numbers, labels, sender and addressee information;

4. Information pertaining to narcotics trafficking, including but not limited to quantities sold, pricing, monies owed, accounts receivable, purchaser information, and correspondence (including mail, e-mail, text messages, and other correspondence);

5. Mobile phone numbers and addresses utilized by known or unknown co-conspirators involved in this criminal conspiracy;

6. Any and all documents that identify and depict a relationship with conspirators, including:
   a. photographs;
   b. phone bills and call logs;
   c. phone books;
   d. address books;
   e. mail, text messages, email, and other correspondence.

As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

7. Evidence of who used, owned, or controlled the SUBJECT TELEPHONES such as logs, internet protocol (IP) addresses, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2

a. evidence of software that would allow others to control the SUBJECT TELEPHONES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

b. evidence of the lack of such malicious software;

c. evidence of the attachment to the SUBJECT TELEPHONES of other storage devices or similar containers for electronic evidence;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the SUBJECT TELEPHONES;

e. evidence of the times the SUBJECT TELEPHONES was used;

f. passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT TELEPHONES;

g. documentation and manuals that may be necessary to access the SUBJECT TELEPHONES or to conduct a forensic examination of the SUBJECT TELEPHONES;

h. contextual information necessary to understand the evidence described in this attachment.

8. Any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed hard disks, or removable hard disk cartridges, software or memory in any form. The search procedure of the electronic data contained in computer operating software or memory devices may include the following techniques which shall be used to minimize the risk that those conducting the search will view information not within the scope of the warrant:

   a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

   b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

   c. "scanning" storage areas to discover and possible recover recently deleted files;

   d. "scanning" storage areas for deliberately hidden files; or

   e. performing key word or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such

        storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the above-listed crimes or other criminal activity, the further search of that particular directory, file or storage area, shall cease.

## ATTACHMENT A

The following devices (SUBJECT TELEPHONES),

> A silver iPhone/Model A1662 with case, IMEI 356597080726743 ("SUBJECT TELEPHONE 1");
>
> A gold iPhone/Model A1662 with case, IMEI 353790082573162 ("SUBJECT TELEPHONE 2");
>
> A silver iPhone/Model A1662 with cracked screen, IMEI 356597080723898 ("SUBJECT TELEPHONE 3"),

which were seized from ERIC MCKNIGHT during the execution of a federal arrest warrant on February 26, 2018 by the FBI, and which are currently in the custody of law enforcement in the District of Maryland.

## ATTACHMENT B

The SUBJECT TELEPHONES may be searched for the following items, which may be seized: All records, documents, items, data and other information that may constitute fruits or instrumentalities of, or contain evidence related to violations of 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute narcotics), including, but not limited to, the following:

1. Information that identifies the conspiracy's unknown co-conspirators and accomplices;

2. The location of stash houses for money and/or narcotics throughout the United States or abroad;

3. Shipping company documents, tracking numbers, labels, sender and addressee information;

4. Information pertaining to narcotics trafficking, including but not limited to quantities sold, pricing, monies owed, accounts receivable, purchaser information, and correspondence (including mail, e-mail, text messages, and other correspondence);

5. Mobile phone numbers and addresses utilized by known or unknown co-conspirators involved in this criminal conspiracy;

6. Any and all documents that identify and depict a relationship with conspirators, including:
   a. photographs;
   b. phone bills and call logs;
   c. phone books;
   d. address books;
   e. mail, text messages, email, and other correspondence.

As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

7. Evidence of who used, owned, or controlled the SUBJECT TELEPHONES such as logs, internet protocol (IP) addresses, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2

a. evidence of software that would allow others to control the SUBJECT TELEPHONES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

b. evidence of the lack of such malicious software;

c. evidence of the attachment to the SUBJECT TELEPHONES of other storage devices or similar containers for electronic evidence;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the SUBJECT TELEPHONES;

e. evidence of the times the SUBJECT TELEPHONES was used;

f. passwords, encryption keys, and other access devices that may be necessary to access the SUBJECT TELEPHONES;

g. documentation and manuals that may be necessary to access the SUBJECT TELEPHONES or to conduct a forensic examination of the SUBJECT TELEPHONES;

h. contextual information necessary to understand the evidence described in this attachment.

8. Any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed hard disks, or removable hard disk cartridges, software or memory in any form. The search procedure of the electronic data contained in computer operating software or memory devices may include the following techniques which shall be used to minimize the risk that those conducting the search will view information not within the scope of the warrant:

   a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

   b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

   c. "scanning" storage areas to discover and possible recover recently deleted files;

   d. "scanning" storage areas for deliberately hidden files; or

   e. performing key word or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such

3

storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the above-listed crimes or other criminal activity, the further search of that particular directory, file or storage area, shall cease.

4